CARSON v. DIERKS LUMBER & COAL COMPANY.

4-5043

Opinion delivered April 25, 1938.

*Earl J. Lane* and *Leo P. McLaughlin,* for appellant.

*Watson, Ess, Groner, Barnett & Whittaker* and *Murphy & Wood,* for appellee.

MEHAFFY, J. This suit was instituted in the Garland circuit court by the appellant, Jim Carson, against the Dierks Lumber & Coal Company to recover damages for injuries sustained on September 20, 1936. He alleged that he was employed by the appellee as a truck driver for the purpose of hauling logs to appellee's mill at Dierks, Arkansas; that the road over which he was driving was under the control and supervision of the appellee, and that it was the duty of the appellee to keep said road and bridges in good repair; that appellee employed a crew at all times to keep said road and bridges in repair, and that it was negligent in failing to keep said bridge in repair, and as the result of such negligence appellant was seriously injured and damaged in the sum of $3,000.

The appellee filed answer, denying all the material allegations in the complaint and pleading contributory negligence, and that appellant assumed the risk.

After the evidence was introduced, the court directed the jury to return a verdict in favor of appellee. The jury returned a verdict as directed by the court, and judgment was entered in favor of appellee. From that judgment comes this appeal.

The appellant testified that he had worked for the Dierks Lumber & Coal Company for about three years driving a truck and hauling logs; that he was hauling logs on September 20, 1936, from Bluff Springs to Dierks; that appellee's mill is located at Dierks; September 20, 1936, was the first day that he had hauled logs over the road from Bluff Springs to Dierks; he had been hauling over other roads; the road foreman for the appellee was Omer Hethcock; he kept the bridges in shape and the road in shape to travel over; the day that appellant was injured he passed over the bridge and saw there was a slight sand hole and the bridge was slightly sunk; when he got to Center Point about 10:15 or 10:30, he stopped and saw Omer Hethcock, the bridge foreman, and told him about the bridge; that it needed to be fixed, and that if it was not fixed somebody would get hurt; the foreman told him that it would be fixed before he got another load; he promised that it would be fixed. On his

third trip to the loading place he was driving about 20 miles an hour; when he went over the hill he thought the bridge was in about the same fix that it was in the morning; when he hit the bridge the trucks had about finished breaking the boards in; the front wheels of the truck hit this hole and dropped down. The appellant then describes at length the accident and the extent of his injuries.

On cross-examination appellant testified that he did not know whether it would be called a public road or not; he thought the bridge was about six feet across; he would call it a large culvert; he could get over it all right; after he had gone over it four times, it looked like it was sagging, but he thought he could get over it all right; there was sand in the bridge and it had been filled over with dirt and was caving in; the foreman told him he would get it fixed before he could get another load across; he did not expect the foreman to get it completely fixed before he got back; he could have fixed a detour around it very easily by the time he got back; the break in the board was a fresh break and he got right on it before he saw it. He then testified about making a statement, but he did not read the statement; the lawyer just told him to sign it.

Omer Hethcock testified that he had been working for the Dierks company 18 or 20 years and that his last job was road foreman where it was his duty to keep any roads that the company's trucks traveled over in good condition; he had to fix bridges and put up signs; he was working for appellee when Carson was injured; about 10:30 in the morning Carson saw him at Center Point and told him about the bridge, and he told Carson that he would go and see about it right now; he had fixed other bridges and put up signs on this particular road; Homer Byers, assistant woods foreman, who was witness' superior, told him to do this work; when bridges got in bad shape he would always tell Homer about it and told him about this bridge and told him that he ought to go out and put a plank in the bridge and Byers told him to go to some other place and put up signs; he saw the bridge after the accident and fixed it afterwards; he knew the

plank had been broken three or four days, but he told Carson he would go and fix it; witness continued to work for the lumber company until January, 1937, when he was fired. He testified that he saw the plank was broken three or four days before the accident; there were no signs up there; you could not see the hole in the bridge until you got right upon it; it was a six or eight-foot bridge; he knew three or four days before the accident that the plank was broken and hauled gravel and piled it over the bridge all the way across; did this three or four days before the accident; when he last went over the bridge you could not see the broken place because it was covered with dirt.

There were a number of other witnesses who testified about the bridge and the statements they said Carson made, and some of the evidence was in conflict with the evidence set out above.

Homer Byers testified that his job was assistant woods foreman, and he was working for the appellee in September, 1936; his duties were to look after the logging operations and see that the orders of the woods foreman were carried out; the appellee had a road crew in Howard county; he never did order the bridge or road crew to do any work on the Corn Ridge road prior to the time Carson had his accident; the first time he did any work was two or three days after the accident they raised the bridge where the accident occurred; he saw the bridge before Carson had his wreck and it was in good condition only a little bit low; some two or three inches below the ground on each side of the bridge; the bridge was not broken; no holes in it; Carson was not directly under witness; there was a foreman he worked under and witness was over this foreman; Hethcock was road foreman; his duties were to work on the road whenever he was told by witness or Mr. Clawson; he saw Hethcock the morning before the accident and gave him orders over the roads and bridges to fix; he was not supposed to fix it until he went up and told witness about it; if a bridge was broken, Hethcock would see witness that night and ask him what to do next day about fixing it; the truck drivers would be going over the bridge regardless of the condition it

was in until Hethcock would see witness that night; that is the way they do things out there; he saw the bridge next morning after the wreck and it was two or three inches low; he had noticed the bridge was low possibly a week before the wreck; they smoothed it over after the wreck; before they had just not gotten to it; had been operating over that bridge with log trucks several years, before the accident; it was no worse after the wreck as to being low than it was before; after the wreck they raised it two or three inches; witness told Hethcock to go down and raise the bridge; just had not gotten to it before.

There was considerable other evidence introduced, but we do not deem it necessary to set it out in detail. We have set out sufficient to show that there was substantial evidence requiring the submission of the question to the jury.

"In testing the correctness of the verdict which was directed to be returned in favor of the appellee, we must give the testimony its strongest probative force in favor of the appellant in determining whether or not there was any negligence shown by the evidence. If there was any substantial evidence tending to show negligence on the part of the appellee resulting in injury to appellant, it would be the duty of the trial court to submit the question of negligence to the jury. It is the province of the jury to pass upon the credibility of witnesses and the weight to be given to their testimony." *Mosley* v. *Raines,* 183 Ark. 569, 37 S. W. 2d 78; *McLeod* v. *Des Arc Oil Mill Co.,* 131 Ark. 594, 199 S. W. 932; *So. Gro. Co.* v. *Bush,* 131 Ark. 153, 198 S. W. 136; *Vaughan* v. *Hinkle,* 131 Ark. 197, 198 S. W. 705; *Bennett* v. *Buckeye Cotton Oil Co.,* 132 Ark. 381, 200 S. W. 993; *Beach* v. *Eureka Traction Co.,* 135 Ark. 542, 203 S. W. 834; *Kirby* v. *Wooten,* 132 Ark. 441, 201 S. W. 115; *Scott* v. *Roberson,* 145 Ark. 408, 224 S. W. 746; *Brotherhood of R. R. Trainmen* v. *Meredith,* 146 Ark. 140, 225 S. W. 337; *Ark. Mining Co.* v. *Eaton,* 172 Ark. 323, 288 S. W. 399; *Ark. Baking Co.* v. *Wyman,* 185 Ark. 310, 47 S. W. 2d 45; *Union Securities Co.* v. *Taylor,* 185 Ark. 737, 48 S. W. 2d 1100.

Appellee argues that Hethcock and appellant were talking about different bridges. We think the evidence clearly shows that they were talking about the same bridge, and Byers also testified about the same bridge where Carson was injured. Appellee says that Clawson and Mitchell testified they merely raised the bridge a few inches without taking it apart and putting in new boards, and the bridge Hethcock was talking about was torn to pieces and had new boards put in it. But the credibility of these witnesses and the weight to be given to their testimony are questions for the jury and not for the court.

It is argued that Clawson, Byers, Cooper and Boone knew it was a low bridge, but thought it was sound and had no reason to believe it to be unsound. If the appellee had inspected the bridge, as the law requires, it would have known that it was not sound. It was its duty to inspect and it was not the duty of the appellant.

It is argued also that appellant knew more about its condition than any of the foremen. He knew nothing about it except what he saw in driving over it, and Byers and other servants of the appellee testified that they knew of its condition three or four days before the accident. The undisputed evidence is that the road foreman had promised to repair it. Appellee having promised to repair it, it became a question for the jury to decide, under all the facts and circumstances in the case, whether the appellant assumed the risk.

It is the duty of a master not only to exercise care to furnish a safe place for its servants to work, but it is also the duty of the master to make inspections, and the servant is not under the duty to inspect.

There is some evidence tending to show that this was a public road, but the undisputed evidence shows that the appellee had such control over it as to make necessary repairs, and if it did have this control, it would be liable to the same extent as if it owned the road and bridge. If the master either leases the premises or has any

arrangement by which he has control, or if he directed the servant to use this bridge, in either event it would be the master's duty to exercise care to inspect and repair. Of course, if the appellee had no control and no right to repair, it would not be its duty to inspect and repair, but in that event it should not direct its servants to use the road.

" 'It is well settled that an employer is not responsible for an injury sustained by his employee, caused solely by unsafe premises which are owned and controlled by a third person, and where the employee's services are performed. The reason of the rule is that the employer does not own, use or control the premises,' and hence is without power to make any change in their condition." *Sparkman Hardwood Lbr. Co.* v. *McCann,* 190 Ark. 552, 80 S. W. 2d 53; *Long* v. *John Stephenson Co.,* 73 N. J. Law, 186, 63 Atl. 910; *Sharpley* v. *Wright,* 205 Pa. 253, 54 Atl. 896; *Hughes* v. *Malden & Melrose Gas-Light Co.,* 168 Mass. 395, 47 N. E. 125; *Trask* v. *Old Colony Ry. Co.,* 156 Mass. 298, 31 N. E. 6; *Harding* v. *Ry. Transfer Co. of Minneapolis,* 80 Minn. 504, 83 N. W. 395; *Hawkes* v. *Broadwalk Shoe Co.,* 207 Mass. 117, 92 N. E. 1017, 44 L. R. A., N. S. 1123; *Granara* v. *Jacobs,* 212 Mass. 271, 98 N. E. 1029; *Wilson* v. *Valley Imp. Co.,* 69 W. Va. 778, 73 S. E. 64, 45 L. R. A., N. S. 271, Ann. Cas. 1913 B, 791.

As we have already said, whether the appellant was guilty of contributory negligence or assumed the risk is, under the evidence in this case, a question for the jury.

"He assumes all the risk and hazard ordinarily incident to the business, and whether the risk was usual or ordinary or not, if it were obvious or plaintiff knew of and appreciated the danger, he would assume the risk. This court has many times announced this doctrine, and it is well settled in this state, but it is thoroughly well settled also that an employee does not assume the risk or hazard caused by the negligence of the master. The servant has a right to rely on the judgment of the master unless the danger is so obvious that no prudent man would incur it under like circumstances." *Owosso Mfg. Co.* v. *Drennan,* 182 Ark. 389, 31 S. W. 2d 762.

There was ample evidence to authorize the court to submit the questions to the jury, and it was error to direct the verdict.

The judgment is reversed, and the cause remanded for a new trial.